```
EXHIBIT
   C
```

 1          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                   SHERMAN DIVISION

 3

 4   IN RE:                )   BK. NO:  16-41044-BTR

 5                         )

 6   PAYSON PETROLEUM, INC. )

 7        D E B T O R.     )

 8

 9

10            *   *   *   *   *   *   *   *   *

11            TRANSCRIPT OF PROCEEDINGS

12            *   *   *   *   *   *   *   *   *

13

14

15

16

17

18

19

20        BE IT REMEMBERED, that on the 25th day of October, 2017,

21   before the HONORABLE BRENDA T. RHOADES, United States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:

1                        <u>I N D E X</u>

2                                                              <u>PAGE</u>

3    <u>JASON SEARCY</u>
          DIRECT EXAMINATION
4              BY:  Mr. Hamm                                    22
          CROSS-EXAMINATION
5              BY:  Mr. Reed                                    35
               BY:  Mr. Walker                                  37
6              BY:  Mr. Watkins                                 39
               BY:  Ms. Dow                                     43
7              BY:  Mr.  Strand                                 48
          REDIRECT EXAMINATION
8              BY:  Mr. Hamm                                    35

9    <u>CHRISTOPHER MOSER</u>
          DIRECT EXAMINATION
10             BY:  Mr. Harvey                                  51
          CROSS-EXAMINATION
11             BY:  Mr. Reed                                    58

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                    COURTROOM DEPUTY:  Number one on the docket is

3    Payson Petroleum, case 16-41044; and Payson Petroleum 3 Well,

4    case 17-40179; and the Payson Petroleum 3 Well 2014, case

5    17-40180.  Joint applications for approval and compromise and

6    settlement agreements in each of the cases.

7                    THE COURT:  All right.  I'll take appearances.

8                    MR. HAMM:  Your Honor, Blake Hamm from Snow

9    Spence Green, LLP on behalf of Jason R. Searcy, Chapter 11

10   Trustee in the Payson Petroleum, Inc; Maricopa Resources,

11   LLC; and Payson Operating LLC cases, and jointly administered

12   case 16-41044.

13                   THE COURT:  Thank you.

14                   MR. HAMM:  And with me today are Mr. Searcy

15   and Mrs. Debbie Merritt, from Trade & Engineering Associates,

16   Limited Partnership, which is a contract operator for the

17   wells at issue in this settlement.

18                   THE COURT:  Okay.  Thank you.

19                   MR. HARVEY:  Your Honor, Keith Harvey

20   representing Chris Moser, who is the Trustee for Payson

21   Petroleum 3 Well 2014, LP; and Payson Petroleum 3 Well, LP.

22   They're Chapter 7 cases, Your Honor.

23                   THE COURT:  Thank you.

24                   MR. REED:  Good morning, Your Honor.  Kendall

25   Reed on behalf of JMW Recovery, LLC, a creditor in the Payson

1   Petroleum case.

2             THE COURT:  Okay.

3             MR. REED:  16-41044.

4             THE COURT:  Okay.  And we have some

5   individuals who wish to appear pro se; is that correct?

6        All right.  I'll let you make your appearances as you

7   come up to the podium to speak when it's time.  All right?

8        All right.  Let's get started, then.

9             MR. HAMM:  Your Honor, Blake Hamm on behalf of

10  Mr. Searcy, along with Mr. Moser for their joint applications

11  to approve the compromise and settlement of adversary

12  proceeding 16-41 -- I'm sorry, adversary proceeding 16-04106.

13       If I could begin, I'd like to offer the Trustee's joint

14  Exhibits 1 through 26.

15            THE COURT:  All right.  Exhibits 1 through 26

16  are admitted.

17            MR. HAMM:  Thank you, Your Honor.  And just as

18  far as an agenda goes, I'd propose I give a brief opening,

19  outline the issues in this matter, and then proceed with

20  Mr. Searcy's case in chief.  Witnesses would be Mrs. Debbie

21  Merritt by way of proffer, if the Court allows it, and

22  Mr. Searcy on direct.

23            THE COURT:  Okay.

24            MR. HAMM:  And finally, Your Honor, I do have

25  a few -- as far as the exhibits, if anybody needs an exhibit

1   notebook, there are extras on this bench.

2              THE COURT:  Okay.  Do any of the parties wish

3   to get a copy of the exhibit notebook?  If you do, if you'll

4   just come up right here and grab one from the bench.

5              MR. HAMM:  And, Your Honor, additionally, if I

6   could --

7              THE COURT:  The notebook is in the box.  Is

8   that what you were looking for?

9       All right.

10             MR. HAMM:  Your Honor, additionally, I did

11  have a few demonstratives which I think will help during the

12  opening.  I have extra copies of those, as well.

13             THE COURT:  All right.  Do I have that?

14             MR. HAMM:  No, Your Honor, if I may approach?

15             THE COURT:  You may.

16             MR. HAMM:  Thank you, Your Honor.

17             THE COURT:  All right.  You may proceed.

18             MR. HAMM:  Thank you, Your Honor.

19       I'd like to begin with giving a brief background on who

20  the parties to this joint settlement -- joint motion to

21  compromise settlement are.  On Mr. Searcy's side and jointly

22  administered case 16-41044 you have Payson Petroleum, Inc.,

23  Payson Operating LLC; and Maricopa Resources, LLC.  Payson

24  Petroleum, Inc., insofar as this adversary proceeding, or the

25  underlying adversary proceeding is concerned, was the

1  operator of several oil and gas wells, including three oil

2  and gas wells located in Grayson County, Texas.  Namely the

3  William 1 H, Row 2, and the Main Number 1 Wells.  Based on

4  operating was essentially a contract, empty shell operating

5  company for Payson Petroleum, Inc.  Maricopa Resources was a

6  company that, based on what we could tell, acquired oil and

7  gas leases, sold oil and gas leases, and had other ventures.

8  On Mr. Moser's side of this particular case, you have Payson

9  Petroleum 3 Well, Limited Partnership, and Payson Petroleum 3

10 Well Point 14, Limited Partnership.  From what we can tell,

11 these limited partnerships were organized for the purpose of

12 acquiring and owning oil and gas interests.

13      There are two contractual relationships that we're

14 aware of between the parties.  Each of the limited

15 partnership signed a joint operating agreement, separate

16 joint operating agreements and separate turnkey agreements

17 with Payson Petroleum, Inc.  The nature of the turnkey

18 agreement was one in which the limited partnerships agreed to

19 pay Payson Petroleum, Inc., a certain amount of money for

20 each well that was drilled and completed on behalf of that

21 limited partnership.  The joint operating agreements, which

22 really aren't at issue in this case, governed operation of

23 the oil and gas leases afterward.  So those are the -- those

24 are the only known contractual relationships between the

25 parties.

1     And one of the demonstratives that I handed to the

2 Court is a time line.  It's a short time line.  It may or may

3 not help the Court.  It helps me keep some of the facts

4 straight.

5     In the months before this time line begins on March

6 28th of 2016, Maricopa Resources assigned its oil and gas

7 interest in the three wells we discussed to the two limited

8 partnerships.

9             THE COURT:  Okay.  Where is that on your time

10 line?

11            MR. HAMM:  I'm sorry, Your Honor, it's before.

12 I didn't include that on the time line.    It's before.  It's

13 March 28th, 2016.

14            THE COURT:  Okay.  Is this the only copy you

15 passed up.

16            MR. HAMM:  I have an additional --

17            THE COURT:  Could you pass up another copy so

18 that that will be the record copy?

19     Thank you.

20            MR. HAMM:  Yes, Your Honor.

21            THE COURT:  That just provides -- we always

22 ask for two copies.  Part of the reason is so that I can

23 write on one.

24     Thank you.  So March 28th?

25            MR. HAMM:  2016, yes, Your Honor.

1            THE COURT:  That's the date you are asserting

2  that Maricopa assigned interest to the two debtor entities?

3            MR. HAMM:  The two limited partnership

4  entities that are managed -- over which Mr. Moser was

5  appointed as Chapter 7 Trustee.

6            THE COURT:  Okay.

7            MR. HAMM:  And the exhibits that relate to

8  those assignments are joint Trustee Exhibits 5, 6, and 7.

9  Those are the record conveyances.

10            THE COURT:  Okay.

11            MR. HAMM:  On June 10th, also not yet on the

12  time line.  I apologize for that.  On June 10th, 2016, Payson

13  Petroleum, Inc.; Payson Operating, LLC; and Maricopa

14  Resources, LLC filed for bankruptcy protection.  And, again,

15  before -- and this is just a -- let me back up a minute.  And

16  I think I should explain to the Court that before the

17  assignments were made on March 28th, 2016, the turnkey

18  agreements were signed between the limited partnership,

19  debtors, and Payson Petroleum, Inc, long before anyone was in

20  bankruptcy.  And those turnkey agreements are at Exhibit

21  Numbers 8 and 9 in the Trustees' joint exhibits.  Each of the

22  turnkey agreements -- and there were two separate ones

23  between each partnership.  Each of the turnkey agreements

24  states that each limited partnership wold pay Payson

25  Petroleum, Inc, a little over $6 million for each vertical

1   well, oil and gas well that was drilled, and a little over

2   $11 million for each horizontal well that was drilled.   In

3   this case as Ms. Merritt will explain, there are two

4   horizontal wells -- I'm sorry, one horizontal well and two

5   vertical wells.   So each limited partnership under the phase

6   of those turnkey agreements owed Payson Petroleum, Inc,

7   approximately $24 million.

8        Those three wells were drilled and completed.   And

9   Ms. Merritt may know more about this, but I believe they were

10  drilled and completed in the 2014 -- in 2014 and 2015. By

11  early 2015, all of those wells had been completed and were

12  producing oil and gas.   So on June 10th, jumping forward to

13  June 10th, 2016, Mr. Searcy's debtors filed for bankruptcy.

14  On November 1st, 2016, beginning with the actual dates on the

15  time line, Mr. Searcy filed the adversary proceeding against

16  the limited partnerships, which were not yet in bankruptcy.

17  In December of 2016, the limited partnerships, both of them,

18  filed an answer to the adversary proceeding.   And then on or

19  about the date of the Rule 26(f) conference in that case,

20  both limited partnerships filed voluntary Chapter 7 cases.

21  Mr. Moser was subsequently appointed as Trustee.

22       One of Mr. Moser's first acts was to file a stay notice

23  staying Mr. Searcy's adversary proceeding against the limited

24  partnerships.   Lift stay motion was filed.   Eventually the

25  stay was lifted by agreement.   On May 2nd of 2016, Mr. Searcy

1   and Mr. Moser met at Mr. Moser's offices here in Dallas to

2   discuss the facts and nature of Mr. Searcy's claims against

3   the limited partnerships and to begin the process of trying

4   to negotiate a resolution.  Those negotiations lasted from

5   that date, May 2nd, 2016 through September 20th, 2016.

6   During that time, at least five term sheets were exchanged.

7   The terms of proposed settlements were significantly altered.

8   Finally, settlement agreement, proposed settlement agreement,

9   the one that the Trustees are asking the Court to approve

10  today was signed on September 20th of 2016.

11          Your Honor, one of the demonstratives that I handed to

12  you is entitled causes of action.  And this particular

13  demonstrative is just an outline of the basic causes of

14  action that Mr. Searcy alleges against the limited

15  partnerships in his adversary proceeding.  The first one is

16  an avoidance action to recover the working interest in the

17  three oil and gas wells that debtor, Maricopa, assigned

18  during the 90 days before bankruptcy to the 200 partnerships.

19  The actual causes of action that were filed were filed under

20  Section 548, both as constructive and actual fraudulent

21  transfers.  In the alternative, Mr. Searcy asserted a

22  preference, preferential transfer claim under Section 547 of

23  the Bankruptcy Code.  It was pled in the alternative because

24  the records that we had did not indicate that Maricopa

25  actually owed those transfers to the limited partnerships, or

1  owed those wellbore oil and gas interest to the limited

2  partnerships, because there was no contractual relationship.

3       The next group of claims in the adversary proceeding

4  were for breach of turnkey agreement.  The turnkey agreements

5  we discussed.  Basically what was alleged in the complaint

6  was that 3 Well, LP under its turnkey agreement with Payson

7  Petroleum, Inc, owed approximately $17 million.  And that 3

8  Well 2014, LP under its turnkey contract owed about $5.3

9  million.  Additionally, under Chapter 24 of the Texas

10 Business and Commerce Code, Mr. Searcy alleged that certain

11 funds, which Payson Petroleum, Inc, had transferred to the

12 limited partnerships, were done so either as constructive, or

13 actual fraudulent transfers.  Again, those transfers occurred

14 in 2014, more than two years before the date Mr. Searcy's

15 debtors filed for bankruptcy.  So the cases of action would

16 be under the Texas statute.

17      The amounts at issue there were approximately, written

18 down here on the demonstrative, about $1.2 million was

19 transferred to Payson Petroleum, Inc, to 3 Well, LP in 2014

20 and approximately 2.8 million was transferred from Payson

21 Petroleum, Inc, to 3 Well 2014, LP in 2014.  The basis for

22 those claims, essentially, was that Payson Petroleum, Inc,

23 made the transfers at a time it was insolvent and did not

24 receive reasonably equivalent value for any value in return.

25      And finally, although this was not alleged in the

1   complaint, it certainly was discussed between the Trustees in

2   as much as they had potential competing, what I would call

3   contribution claims against general partners of the two

4   limited partnerships.  Payson Petroleum, under the Texas

5   Business & Organizations Code and Mr. Moser, under Section

6   723 of the Bankruptcy Code, in large part that was the issue

7   raised during the stay.

8        Your Honor, one other demonstrative which was handed to

9   you is entitled, Terms of Proposed Compromise.  And this

10  demonstrative tries to lay out into our form the basic terms

11  of the compromise that the Trustees are asking you to approve

12  today.

13       The -- as far as the breach of turnkey agreement claims

14  are concerned, the Trustees have agreed that Payson

15  Petroleum, Inc. would have allowed -- and this will be

16  modified a little bit.  But they agreed that they would have

17  allowed unsecured claims in each of the limited partnership

18  cases for half of the amounts that were alleged in the

19  complaint.

20       Subsequent to filing the joint motion to compromise,

21  the Trustees further agreed that those claims, if the

22  settlement is approved, would be subordinated to all timely

23  filed, allowed general unsecured claims in those cases.  So

24  that is an additional compromise that was reached after the

25  joint motion was filed.

1       Regarding, Your Honor, the avoidance actions that

2   Mr. Searcy alleged to recover the oil and gas interest in the

3   three wells.  The Trustees have agreed that the limited

4   partnership debtors would re-assign those interest to

5   Maricopa Resources, LLC.  And that Mr. Moser -- I'm sorry,

6   Mr. Searcy would then market and sell those interest, along

7   with whatever other interest his estates hold.  For example,

8   the operating rights.  And that 55 percent of the net

9   revenues, or net proceeds of that sale would go to Maricopa.

10  The other 45 percent of the net proceeds would go to

11  Mr. Moser's debtors in an amount that was agreed upon.  I

12  think 12.5 percent would go to the 3 Well, LP and 32, about

13  32 1/2 percent would go to the 2014, LP debtor.

14      Additionally, Mrs. Merritt will testify that Trayton

15  Operating, since it has begun operating these wells, has

16  suspended the net revenues from these wells.  And they're

17  holding those in suspense.  And that was about -- it's about

18  $597,000 at this point, since they've been operating the

19  wells.  Attributable to production through the end of August

20  2017.  Whatever Trayton has would also be distributed in

21  those same percentages.  In other words, 55 percent to the

22  Maricopa estate and the remaining 45 percent to Mr. Moser's

23  estates.  There would, however -- the settlement agreement

24  does call for a 50 percent carve out of those suspended

25  revenues for operations.

1           THE COURT:  50 percent or 50,000?

2           MR. HAMM:  50,000.  I'm sorry, thank you, Your

3  Honor.  $50,000.would be carved out for operations for

4  Trayton, until the wells are sold.

5       As part -- the remaining terms of the settlement

6  agreement are wound up in the global nature of it.  And the

7  parties have agreed, Mr. Searcy and Mr. Moser, have agreed

8  that Payson Petroleum, Inc -- I'm sorry, let me step back.

9       Additionally, with regards to the avoidance action on

10  the working interest, Your Honor.  I'm sorry.  Each limited

11  partnership will obtain an allowed 502(h) claim in Maricopa's

12  bankruptcy case for whatever the value is of the assets they

13  transferred, which won't be determined under after they're

14  sold and the net proceeds are distributed.

15      The remaining terms of the settlement agreement, Your

16  Honor, are essentially that Payson Petroleum, Inc, would

17  obtain a 50 percent participation interest in limited

18  partnership avoidance actions, if any.  It appears there may

19  be a few.  And a 50 percent participation interest in any

20  partner related claims either under the Texas Business &

21  Organizations Code Section 723(a), the Bankruptcy Code, or

22  otherwise.  The LPs would retain the other 50 percent

23  interest in the proceeds of those claims, if any are

24  generated.  And Mr. Moser has agreed that Mr. Searcy -- if

25  the settlement is approved, that Mr. Searcy would have

1   standing on behalf of Payson Petroleum to assert those claims

2   in the LP debtor cases.

3        Now regarding the objections that have been filed.  I

4   counted this morning.  My last count, 103 objections have

5   been filed to the proposed settlement, or to the motions

6   asking the Court to approve the settlement.  I did hand the

7   Court a chart of most of the objections.  Not all of them are

8   on this chart, because some were filed late.  The objections

9   are all filed in case jointly administered 16-41044, the

10  Payson cases administered by Mr. Searcy.  No objections were

11  filed to the motions in the limited partnership cases

12  administered by Mr. Moser.  The objections, to the best of my

13  knowledge at last count, can be found at docket numbers 154

14  to 164, 166 to 240, 242 to 245, 247 to 250, and 252 to 263.

15  Again, all in case 16-41044.

16       All but one of these objections was filed by either a

17  partner in one of the two limited partnerships, or both,

18  administered by Mr. Moser, or a person with an interest in a

19  partner of one of the two limited partnerships.  All but

20  five -- I'm talking about all 103 objections now, Your Honor.

21  All but five, are substantially identical.  With the only

22  change being the name of the objecting party.  Four of what

23   I -- in the joint response that was filed to the objections

24  are referred to as the partner objections.  Four of the

25  partner objections are different.  Those particular

1  objections can be found at docket numbers 243 to 245.  They
2  were filed -- each of those three objections is the same.
3  And they were all filed on behalf of Michael Neiman, Julie
4  Wakefield, and Terry Dolmyer.  The other partner objection,
5  which was different than the rest, was filed at docket number
6  256 by Mr. Phillip Strand.  The one objection that was not
7  filed by a partner or a person with an interest in a partner
8  was filed by JMW Recovery, LLC, whose attorney is present in
9  court today.  The nature of that objection was that there was
10 not sufficient interest regarding the value of the wells at
11 issue in this case, or the value of the claims that would be
12 granted to Payson Petroleum, Inc, in the limited partnership
13 cases for JMW to determine whether or not it should object.
14 I have discussed that issue with attorneys for JMW recovery,
15 but no resolution has been reached.

16       The -- having read the partner objections, Your Honor,
17 it appears that the main issue -- and I'm sure people can
18 tell me otherwise.  But it appears that the main issue that
19 the partners have for the settlement is that they do not
20 believe that if the settlement is granted, they will obtain a
21 recovery from the cases that applied.

22       In most of the partner objections, the ones that are
23 identical, the partners note that the reason that bankruptcy
24 was filed for the two limited partnerships was that the
25 partnerships did not have funds to defend against

1  Mr. Searcy's litigation.  So the handling of that litigation

2  was turned over to a Chapter 7 Trustee, which in this case

3  turned out to be Mr. Moser.

4      Your Honor, at this time, I'm ready to proceed with

5   Mr. Searcy's case in chief and would like to begin by

6  proffering the testimony of Mrs. Debbie Merritt, if it is

7  acceptable to do so to the Court.

8          THE COURT:  Okay.  Before you do, I'll take

9  any opening arguments or opening statements from any party to

10  wishes to make that statement.  And I'll let you do closing

11  statements, too.  If you want to wait until the end, that's

12  fine, too.

13      Mr. Harvey.

14          MR. HARVEY:  Your Honor, I'd just like to --

15  Keith Harvey for Mr. Moser.

16      I'd like to adopt the introduction that Mr. Hamm made.

17  And, also during the testimony, I'd like the Court to focus

18  on the economics of this case, as well as the law and the

19  litigation and the other TMT factors.  When the Court looks

20  at the economics of this case, through the negotiation of

21  Mr. Moser, we went from an offer of $50,000 to a

22  substantially better offer in which we have a high likelihood

23  of paying the secured creditors, some of the unsecured

24  creditors in the case.  Irrespective of the way that this

25  goes, based on the economics of the case.  The objecting

1   parties have a very low likelihood of getting anything in

2   this case, Your Honor.  And I'd like to point out, if the

3   Court looks at the summary of the objecting parties, the

4   majority of them are GPs, which means they also have

5   potential liability in this case and there may be demands

6   made against them to contribute monies to this case.

7       Thank you, Your Honor.

8            THE COURT:  Thank you.

9            MR. REED:  Your Honor, Kendall Reed for JMW

10  Recovery.

11      Just real quickly.  Our response to the settlement has

12  always been that we haven't been provided sufficient

13  information and the Court hasn't been provided so far

14  sufficient information to value the various assets and claims

15  that are being exchanged in the settlement.  We hope through

16  testimony here that that can be clarified so that we can

17  understand exactly what is being exchanged and the value of

18  those exchanges.

19          THE COURT:  Okay.  All right.  You may

20  proceed.

21          MR. HAMM:  Your Honor, I begin with the

22  proffer of Mrs. Merritt's testimony.

23      Follows the proffer of the testimony of Debbie Merritt

24  who being present in the courtroom on October 25th, 2017 at

25  9:30 a.m. for the hearing on the joint motion to approve

1   compromise and settlement pursuant to Bankruptcy Rule 9019

2   filed at docket number 154 in jointly administered case

3   number 16-41044; docket number 34 in case number 17-40179;

4   and docket number 31 in case number 17-40180 would testify as

5   follows, if called in person.

6        My name is Debbie Merritt.  I m the vide president of

7   Trayton Engineering Associates, LP and the manager of

8   marketing, accounting, and production reporting.  Among other

9   things, Trayton has served as a Court-approved, contract

10  operator of oil and gas properties in several bankruptcy

11  cases, including In re Hawk Hill Operating Company, LLC in

12  bankruptcy case number 04-60319-RLJ, Bankruptcy Court for the

13  Northern District of Texas; In re Whitehead Production

14  Company, Inc in bankruptcy case number 08-45475-DML in the

15  Bankruptcy Court for the Northern District of Texas; In re

16  Primera Energy, LLC, bankruptcy case number 15-51396-CAG in

17  the Bankruptcy Court for the Western District of Texas; and

18  In re Continental Exploration, LLC, bankruptcy case number

19  15-41607 in the Bankruptcy Court for the Eastern District of

20  Texas; and finally, In re AIX Energy, Inc, bankruptcy case

21  number 15-34245-SGJ in the Bankruptcy Court for the Northern

22  District of Texas.

23       Trayton has operated the Crow Number 2, Elaine Number

24  1, and William Number 1H Wells as a contract operator since

25  being retained to do so by Jason R. Searcy, Chapter 11

1   Trustee for the Payson Operating, LLC bankruptcy estate.  The

2   order approving Trayton's retention was signed on August 1st,

3   2016 in bankruptcy case number 16-41045 and is found at

4   docket number 76 in that case.

5        All three wells are located in Grayson County, Texas.

6   The Crow Number 2 Well is a vertical well that was completed

7   in April of 2014.  Originally created in the viola formation,

8   the Crow Number 2 Well was re-completed in the cordell

9   formation at about 9,900 feet below surface in 2015. The

10  Elaine Number 1 Well is also a vertical well which was

11  completed into the viola formation in May of 2014 between

12  10,000 and 11,270 below the surface.  Both of these wells

13  produce approximately 5 to 10 barrels of oil per day and a

14  small amount of natural gas.

15       The William Number 1H Well is a horizontal well that

16  was completed into the viola formation in January 2015 at

17  between 10,000 and 15,000 feet below the surface.  Trayton

18  recently did some work on the William Number H Well that

19  increased production to more than 100 barrels of oil per day

20  for a short period of time that the well is now back down to

21  producing about 25 barrels of oil per day.  It may be

22  possible to increase production from these wells with capital

23  expenditures, such as coil tubing clean outs, or

24  re-completions into other potentially viable oil and gas

25  formations.

1          At Mr. Searcy's instruction, Trayton has suspended net

2    revenues obtained from the sale of hydrocarbons produced from

3    these three wells.   As of today's date, Trayton is holding

4    $597,076.83 in suspense, which accounts for hydrocarbons sold

5    through the end of August of 2017.   $166,209.68 of that

6    amount is attributable to Payson Petroleum 3 Well, LP's

7    record title interest in the three wells.   And $430,867.15 is

8    attributable to Payson Petroleum 3 Well 2014, LP's record

9    title interest in these three wells.

10         And that is the end of Ms. Merritt's testimony.

11                   THE COURT:  Okay.  If the witness will step

12   forward and be sworn.

13                   (The witness was sworn by the courtroom deputy.)

14                   THE COURT:  All right.  Would you state your

15   name for the record?

16                   THE WITNESS:  Debbie Merritt.

17                   THE COURT:  Okay.  And you were in the

18   courtroom when counsel proffered your testimony?

19                   THE WITNESS:  Yes.

20                   THE COURT:  Now that you have been sworn,

21   would you adopt that proffer as your sworn testimony?

22                   THE WITNESS:  Yes, Your Honor.

23                   THE COURT:  All right.  Does anyone wish to

24   cross-examine the witness?

25         All right.  You may be seated.  Thank you.

1        Okay.  You may proceed.

2                     MR. HAMM:  Thank you, Your Honor.  We'd call

3    Mr. Jason Searcy.

4                     THE COURT:  Mr. Searcy, if you'd step forward

5    and be sworn.

6                     (The witness was sworn by the courtroom deputy.)

7                     MR. HAMM:  Your Honor, may I approach the

8    witness to hand him a copy of the exhibit notebook?

9                     THE COURT:  You may.

10                    MR. HAMM:  Thank  you.

11                         <u>JASON SEARCY</u>

12    The witness, having been duly sworn to tell the truth,

13   testified on his oath as follows:

14                       <u>DIRECT EXAMINATION</u>

15   BY MR. HAMM:

16       Q.   Mr. Searcy, if you could please take a moment to

17   introduce yourself to the Court and explain your relationship

18   to this matter.

19       A.   My name is Jason Searcy.  I am the Chapter 11

20   Trustee for Payson Petroleum, Payson Operating, and Maricopa

21   Resources.  And I'm also the plaintiff in the adversary that

22   is being settled, hopefully, today.

23       Q.   Thank you.

24        Do you have experience as a Trustee in oil and gas

25   bankruptcy cases, aside from this?

1      A.    Yes.   I have served as a Trustee since 1987.   So I

2   have 30 years as a Trustee.   During that time, I have served

3   as a Chapter 7 and a Chapter 11 and a post-confirmation

4   Trustee in many, many oil and gas cases.   I've never really

5   counted them, but it's in the dozens.   I would guess 40 or

6   50, in that capacity, at least.   Probably more than that.

7      Q.    Thank you.

8       And what claims are you asserting against Payson

9   Petroleum 3 Well, LP and Payson Petroleum 3 Well 2014, LP on

10   behalf of Maricopa in the adversary proceeding?

11      A.    The claims of Maricopa are basically avoidance

12   claims for the transfer of the working interest in three

13   wells, as you explained earlier; the Elaine, the Williams 1,

14   and the Crow Number 2.   All of the working interest in those

15   wells was transferred from Maricopa to the limited

16   partnership defendants in the appropriate percentages set

17   forth in the assignment.

18      Q.    And, in your opinion, what are the factual basis

19   for these claims?

20      A.    Well, Maricopa owned the leases and, therefore,

21   owned the wells.   Maricopa had no contractual obligation that

22   we've been able to find to transfer the wells out to anyone

23   else.   Maricopa conveyed them within 90 days before

24   bankruptcy was filed.   Maricopa, based upon the financial

25   records, was insolvent basically at all times.   Obviously at

1    least at the time the transfer was made.  And Maricopa

2    received nothing in return for the transfer.

3         Q.   What claims are you asserting against these two

4    partnerships administered by Mr. Moser on behalf of Payson

5    Petroleum, Inc, in the adversary proceeding?

6         A.   Payson Petroleum made payments -- actually, it's

7    two different kinds.  One is there's a turnkey contract

8    agreement with each of the LP debtors.  Under the terms of

9    the contract, each agreed to pay to Payson Petroleum

10   approximately $25 million.  Neither of them paid the full $25

11   million.  We have sued them for breach of contract for the

12   unpaid portions under those contracts.  We also have sued

13   them for -- under state law for fraudulent transfer avoidance

14   actions due to some money that flowed from Payson Operating

15   to each of the partnerships that we've been unable to explain

16   why -- why Payson would owe the partnership money at that

17   time.  And it appears to be part of a scheme or fraudulent

18   transfer.

19        Q.   You just referenced some turnkey agreements, right?

20        A.   Yes.

21        Q.   Could you please turn and look at Exhibit

22   Numbers -- I'm sorry, Trustee Exhibit Numbers 8 and 9?

23        A.   Okay.

24        Q.   And after you've had a chance to review those, are

25   these the turnkey agreements you were referring to?

1    A.    Yes.   8 is the contract with Payson Petroleum 3

2  Well, LP.   9 Is the one with Payson Petroleum 3 Well 2014,

3  LP.

4    Q.    Okay.   Could you please explain what the terms of

5  the proposed settlement -- could you explain the terms of the

6  proposed settlement that you and Mr. Moser are asking the

7  Court to approve?

8    A.    I'll try to do that.   It's a little complicated.

9  But I'll try to do that.

10    Q.    And if you need to, the settlement agreement,

11  itself, proposed agreement is Exhibit Number 2 in your

12  notebook.

13    A.    All right.   Basically, the compromise calls for the

14  properties to be re-conveyed from the limited partnerships to

15  Maricopa and to be back under my control.   I will then market

16  and sell those properties for the best that we can get.   The

17  highest return that we can get.   The proceeds from the sale

18  would be divided 55 percent kept by Maricopa and 45 percent

19  to the partnerships in the percentages in which they

20  currently have record title to the properties.   I think you

21  went through those percentages earlier in your statements.

22      The Payson Petroleum claims, a judgment will be granted

23  for the amount of the unpaid debts.   But only half of that

24  amount for the breach of contract claim will be allowed as an

25  unsecured claim in the LP bankruptcy estates.   That claim,

1  we've agreed, would be subordinate to all other timely filed

2  general unsecured claims that were filed in the case.  And,

3  effectively, that's the way we are dealing with that.  We

4  are not trying to recover anything and will not recover

5  anything for the state court fraudulent transfer claims, for

6  the payments that were made earlier.  As best we can tell

7  under the accounting, that money went back and forth numerous

8  times.  So we just did not feel it was appropriate to try to

9  force a recovery based on that.  Both the debtors, for which

10  I am Trustee, and the debtors, for which Mr. Moser are

11  Trustee, have certain causes of action and claims against

12  general partners.  And rather than be the first to the

13  courthouse and fight over who gets whatever recovery there

14  is, we agreed that those would be divided 50/50.  And that I

15  would have the standing to pursue those claims on behalf of

16  both.

17      Q.    So you -- if the settlement is approved, you would

18  be in charge of selling the interest in these three wells,

19  correct?

20      A.    Yes.  I would retain a marketing company.  I would

21  not do it myself.  I would hire, with Court approval, a

22  marketing company who does that much better than I can.  And

23  then we would go through that process and we would ask the

24  Court for approval of any sale that was ultimately proposed.

25      Q.    And do you have experience selling oil and gas

1  properties of this type in bankruptcy?

2      A.   Yes.  I have been involved in the sale of hundreds

3  of oil and gas properties through bankruptcy process and

4  outside of bankruptcy, as well.

5      Q.   Based on your experience and what you know about

6  the William 1H, Crow 2, and the Elaine Number 1 wells, what

7  do you believe could be obtained from a sale of these

8  properties, if the Court approves the sale?

9      A.   First, let me say it's very difficult to value oil

10  and gas properties because it's not like a house where you

11  know what the house next door sold for.  You're dealing with

12  holes that are drilled two miles down in the ground and you

13  don't know what the geology is.  And it can change within 100

14  yards from one well to another.  And you don't know what

15  issues you have down hole with the wells.  These wells, in

16  particular, are a little unique in that they -- the two

17  vertical wells are very low producers.  They only produce

18  about five barrels a day, which is marginal as to whether --

19  they probably are remaining profitable, but just barely

20  profitable when you add in the cost.  But there's a lot of

21  maintenance that needs to be done on them.

22      There are the potential for re-completion in other

23  zones that we think we see.  But that's -- purchasers have to

24  agree that that is there before they're willing to pay for

25  that potential upside.  And every engineer looks at them

1  differently.  Every geologist looks at them differently.  But

2  based upon my experience, I would think one method you can

3  use to get a general valuation is to just take the income and

4  do a multiple working interest like that, generally working

5  with 24 month multiple.  So with no more than that

6  information, these properties would probably sell, the low

7  end, 6, $700,000, the high end a million and a half.

8      Q.   Okay.  Thank you.  You had discussed as part of the

9  proposed settlement, Payson Petroleum, Inc, would obtain

10 subordinated, allowed, unsecured claims?

11     A.   Correct.

12     Q.   In both cases, right?

13     A.   Correct.

14     Q.   And do you know the value of those claims?

15     A.   Have no way of knowing.

16     Q.   Why not?

17     A.   Well, I don't know what claims -- I don't know all

18 of the claims that have been filed in his estate.  I don't

19 know what recoveries ultimately will be for his estate.  So

20 it's impossible to say what the percentage recovery would be.

21 I doubt they'll be paid in full.  But hopefully there will be

22 some recovery.

23     Q.   And part of the consideration is also that Payson

24 Petroleum, Inc's estate and Mr. Moser's estate would

25 essentially each have a 50 percent participation interest in

1    certain claims, such as avoidance actions and partnership

2    related claims, right?

3        A.    Correct.

4        Q.    Do you know the value of those claims?

5        A.    I do not.  We know -- or at least we believe that

6    something exists, based upon the review that we have done at

7    this point.  But we have no way of knowing what defenses

8    there are.  We have no way of knowing how collectible they

9    are.  So we don't know what the ultimate recovery on any of

10   those will be.

11       Q.    Thank you.

12        You heard Mrs. Merritt's testimony that Traydon is

13   holing $597,000 -- $597,076 in suspense attributable to

14   production through the end of August 2017, right?

15       A.    Yes.

16       Q.    Why is Traydon suspending that revenue?

17       A.    There is a dispute -- they did it at my direction,

18   because there's a dispute as to the ownership of the property

19   and the way you maintain the status quo under those

20   circumstances.  As you suspend the revenue, because the

21   revenue is there, regardless of which party ultimately wipes

22   up as being the true owner.  It's a standard practice in the

23   oil and gas.  And most joint operating agreements have that

24   provision that allows it.

25       Q.    Thank you.

1     And as a Trustee, in your experience -- do you have

2  experience prosecuting claims like the ones that are asserted

3  in this adversary proceeding that we are hoping to resolve?

4     A.   As a Trustee and as a lawyer, yes.

5     Q.   In your opinion, what would it cost your estates in

6  additional litigation expenses to try this matter?

7     A.   My estates have retained your firm on a contingency

8  fee.  But the contingency increases, if you have to try it

9  from where it is currently.  Currently it's a third.  It will

10 go up to 40 percent, if you actually have to try it.  Your

11 firm is entitled to recover all expenses that are incurred.

12 If we have to try this case, it will require, likely require

13 experts on accounting, on oil and gas geology and on

14 valuation.  Petroleum engineers to do the valuation of

15 properties and those sorts of (indecipherable word).

16 Probably experts would cost 100 to $200,000 alone.  Your fee

17 would be increased by whatever that percentage of recovery at

18 the end would be.  So I would guess 200 to $250,000.

19    Q.   Why do you believe that the proposed settlement is

20 in the best interest of Maricopa and Payson Petroleum, these

21 creditors?

22    A.   At this point, Maricopa has no money to pay any of

23 its creditors.  None of the debtors in any of our estates are

24 holding any money to pay any creditors at this time.  Each of

25 the estates have millions of dollars worth of claims.  The

1  three that I'm Trustee for, two of them have $5 million worth

2  of claims that are filed from trade creditors who actually

3  work on the wells, or who actually hold liens against the

4  property.  The third one has about $8 million worth of

5  claims.  This allows for a reasonable recovery on those

6  claims.  When you consider the litigation risk and the cost

7  and the time, delays, it is a fair recovery to them.  You

8  have to remember that these properties are depreciating in

9  value every day.  They have a pretty steep decline curve on

10 their production.  So the longer you delay on marketing them

11 and getting them out, and selling them, the more you're

12 reducing your ultimate recovery.

13     Q.   Why do you believe that the proposed settlement is

14 fair?

15     A.   I'd just reiterate, again, none of these estates

16 have any money.  This is an opportunity basically to do a

17 50/50 split between the two estates on Mr. Moser's part and

18 the three estates on my part so that all valid creditors will

19 get some recovery on what they have done without burning all

20 of the assets by continuing fighting in litigation.  So to me

21 it's as far as you can get.  There's nothing fair about the

22 overall circumstances that led us here.  But these

23 settlements are fair.

24     Q.   And regarding the creditors in your cases.  What

25 type of creditors are in your cases, in the majority?

1          A.     Almost all of the creditors in my cases are trade

2     creditors.   They're people who work on the wells themselves

3     and they've provided the services that created oil and gas

4     wells to be drilled.   One creditor is a judgment creditor

5     where they sued some of the debtors and did a settlement

6     where they got liens and obligations to pay for about, I

7     think it's about $2 million across the three creditors.   So

8     they're the only one that are not a trade creditor.

9                    MR. HAMM:   Thank you.   No further questions.

10                   THE COURT:   All right.   Cross?

11           If you have some cross, you may proceed.

12                   MR. REED:   Yes, Your Honor, just a few

13    questions.

14                       CROSS-EXAMINATION

15    BY MR. REED:

16         Q.     Good morning, Mr. Searcy.   My name is Kendall Reed.

17    I believe we've met before.   You understand I represent JMW

18    Recovery, LLC?

19         A.     Is that the successor to Mr. Wheeler?

20         Q.     Yes.   The judgment creditor you were talking about

21    just earlier.

22         A.     Yes.

23         Q.     I have a few questions.   And one of my first is you

24    mentioned that your litigation counsel in the adversary is on

25    a contingency basis, correct?

1        A.    Correct.

2        Q.    And so what is the value that you're placing on the

3    settlement for that contingency fee?

4        A.    I don't really have -- haven't really totaled it up

5    and have no way to do so, until we know what we get for the

6    properties.  His contingency will be based on whatever

7    portion of the sale of the proceeds from the sale of the

8    properties when they're sold.  So I don't know what that

9    portion of his number is.  But his number would be 55 percent

10   of whatever the escrowed money is, the suspense money.  And

11   then as we go forward, as we make recoveries, it would be

12   whatever that is.  So we don't know what that is yet.

13       Q.    Okay.  And that's part of what you've been saying

14   before is that you haven't -- you haven't been able to value

15   the well assets that are being transferred, correct?

16       A.    The three wells themselves?

17       Q.    Yeah.

18       A.    Oh, I have an opinion as to what I think they're

19   going to sell for.  But they're only worth whatever someone

20   is willing to pay for it.  And that's what will be recovered,

21   is whatever we can get the highest purchase price for.

22       Q.    And your opinion was based upon a multiple of the

23   income that's in suspense right now, correct?

24       A.    Yes.  Yes.

25       Q.    And you said you did that as, how, three times?

1      A.    24 months.

2      Q.    24 months, okay.   So you're doubling those, then?

3      A.    Doubling --

4      Q.    How long has the revenue been in suspense?

5      A.    It's been since May, April or May of 2015.   They

6  pay about 30 or $35,0000 a month.

7      Q.    Have you had any offers for these well interests?

8      A.    I don't own it to sell.   So I have not marketed it

9  to try to get offers.   There's people that have expressed

10  interest that if we get them back, yes, they would be

11  interested in looking at it.   But nobody has offered any

12  money.

13      Q.    But they haven't given you a number.   They've just

14  said, If you get it back, we'll be interested?

15      A.    We'll look at it, yes.

16      Q.    Okay.   And have you retained anybody to market and

17  sell these properties?

18      A.    No.

19      Q.    You haven't gotten any -- any opinions as to the

20  reserves for these wells?

21      A.    Well, no.   We haven't done a reserve study.   A

22  reserve study would probably cost $50,000.   And we don't have

23  $50,000 to pay someone to do a reserve study.

24      Q.    The -- in negotiating the settlement, what value

25  did you put on the unsecured claims that you're getting as

1  part of the exchange?

2      A.   Didn't really value -- didn't put a monetary value.

3  It's half of whatever they are.  I mean, it's a percentage of

4  whatever they are.  We have no way of knowing what that will

5  be.

6      Q.   So if you can't know, you're just splitting them

7  evenly?

8      A.   Yes.

9           MR. REED:  I have no further questions, Your

10  Honor.

11           THE COURT:  Thank you.

12      Any other cross?

13      Redirect?

14           MR. HAMM:  Just briefly.

15           REDIRECT EXAMINATION

16  BY MR. HAMM:

17      Q.   Mr. Searcy, just to try to clean up the record.  I

18  believe you were talking about the percentages of Snow Spence

19  Green's contingency fee in this case?

20      A.   In part, yes.

21      Q.   Okay.  And what is that contingency fee?

22      A.   I think it's a third.

23      Q.   33 percent; is that right?

24      A.   Correct.

25      Q.   Not 55 percent?

1      A.    No.   Your contingency fee would be a third of 55

2  percent of the suspense funds.

3      Q.    Thank you.

4       And earlier you had -- you were discussing when -- with

5  JMW's attorney when Traydon Operating began suspending

6  revenues?

7      A.    Yes.

8      Q.    And you said, April or May of 2015.   That would be

9  2016, wouldn't it?

10      A.    Well, no.   They began suspending revenues -- well,

11  we didn't pay any revenues out when I was appointed until we

12  got them involved.

13      Q.    Okay.

14      A.    First place, we weren't set up -- my office is not

15  set up to do that.   Their office is set up with all of the

16  accounting and the programs to do that.   So we didn't

17  distribute any money.   So the suspense funds that we are

18  holding, which is what I was trying to say, started, I think

19  it's May production of 20 -- I think it's -- well, it's '16,

20  you're right, May production of 2016 through August of 2017.

21      Q.    Thank you.

22                MR. HAMM:   No further questions, Your Honor.

23                THE COURT:   Okay.   All right.   Anything

24  further for this witness?

25       Who are you -- do you want to come up to the

1  microphone, sir?

2      Okay.  First, I need you to state your name for the

3  record.

4              MR. WALKER:  Okay.  Thank you, Your Honor.  My

5  name is Jimmy Walker.  And I'm one of the partners in the LP.

6              THE COURT:  Which LP, sir?

7              MR. WALKER:  The 3 Well, Payson Petroleum 3

8  Well.

9              THE COURT:  Okay.

10              CROSS-EXAMINATION

11 BY MR. WALKER:

12     Q.  And my question for Mr. Searcy is, weren't those

13 wells shut down for a large part of 2016, maybe some of 2015

14 because of the price of oil dropping below $50 a barrel, and

15 we agreed not to sell oil at  that price until it got up back

16 up, $50 a barrel?

17     A.  I can't answer for what happened before I took over

18 the wells.  But I don't think they've been shut-ins since I

19 -- I mean, they were shut down once because there was a

20 mechanical issue on the Crow Well, so it didn't produce on

21 the wells.  So it didn't produce for a while because of

22 operational issues.  But not since I've been involved with

23 it.

24     Q.  Okay.  Well, we were told that they -- when the

25 price of $50 a barrel that they recommended that we not sell

1    oil until it got back over $50 a barrel.  And I think all of

2    us voted, stockholders voted not to sell the oil, unless it

3    was over $50 a barrel.  So that was my question for you.

4                    THE COURT:  All right.

5                    MR. WALKER:  I would like to ask some other

6    things later.  But --

7                    THE COURT:  Ask this witness?  We're getting

8    ready to allow the witness to relieve this man.  Did you have

9    other questions that are related to the matter before the

10   Court today?

11                   MR. WALKER:  That was the main question I had.

12   When they were talking about the amount of production from

13   these wells, it didn't sound like to me that these wells were

14   producing what they could have.  There should have been a lot

15   more money involved in these and there's not.  Because the

16   wells - -the oil wasn't being produced.  It wasn't being

17   sold.

18                   THE COURT:  All right.  Thank you.

19                   MR. WALKER:  Thank you.

20                   THE COURT:  All right.  Does anyone else have

21   any questions for this witness?

22        Yes, sir.  I need you to first state for the record who

23   you are.

24                   MR. WATKINS:  My name is Robert Watkins, one

25   of the general partners for 2014.

1              THE COURT:  Okay.

2              MR. WATKINS:  LP.

3              <u>CROSS-EXAMINATION</u>

4    BY MR. WATKINS:

5         Q.   Sir, question, what caused Maricopa to go bankrupt?

6         A.   Well, you'd have to ask Maricopa that.  I can tell

7    you from their schedules that they owed about $5 million in

8    trade debt that they did not pay.

9         Q.   Different well.

10        A.   It was on the Turner well, primarily.  And they

11   also owed about $2 million to -- I can't remember his

12   clients's current name.  But it was Mr.  Wheeler who got a

13   judgment against them.  And now it's in MWT -- or M -- any

14   way, he owes about $2 million there.

15        Q.   In the exhibits they showed a statement that said

16   in early of '15, I think it was, Maricopa was solvent.  And

17   three months later they had a $5 million debit.  And that's

18   the reason I'm asking that question.

19        A.   Sure.

20        Q.   So, in other words, it sounds like a domino affect

21   that if something happened that caused $5 million debit in

22   the matter of two or three months.  That was one of my

23   questions.

24        A.   It appears to me that it was -- that there was a

25   well drilled called the Turner Well, which is -- also owned

1  leases owned by Maricopa.  And the Turner Well did not work,

2  or it wasn't completed, for whatever reason.  And they didn't

3  pay their bills.  Maricopa owed about 4 or $5 million.

4       Q.    Second question.  In each of the companies, or

5  limited partners, or LLCs that you're representing, are they

6  all managed and owned by the Griffin Brothers?

7       A.    The three debtors that I am the Trustee are for

8  are.

9       Q.    So, in other words, in looking at the money aspect

10  of it, you've made the statement that Maricopa never received

11  any compensation for the leases?

12       A.    That's correct.

13       Q.    But they are -- in accordance with the agreements.

14  They're to received, was it $25 percent of the revenues, net

15  revenues, once production starts?

16       A.    I've never seen that agreement.

17       Q.    Okay.  That was my understanding that that's what

18  they were going to receive.  So, therefore, it would be like

19  kind, if that's true.  The second part of it was, because

20  you're representing these three entities, they all are

21  managed or the same person.  So in reality, it's a shell game

22  between three companies that one individual is controlling,

23  or two individuals.  And, therefore, we, as general partners,

24  paid $23 million to this three entities, such that we are

25  going to receive the benefits of the three wells.  And

1   Maricopa was going to receive compensation as part of that

2   production.  So, therefore, it seems logical to me that they

3   were compensated in kind by that agreement.

4                   MR. HAMM:  Your Honor, objection.

5   Multifarious --

6                   THE COURT:  All right.  Thank you.

7        Did you have a question for this witness?

8                   MR. WATKINS:  One question.

9                   THE COURT:  All right.

10                  MR. WATKINS:  And I believe he's answered it.

11  Was Maricopa compensated?  And he says, no.  And it's my

12  recommendation to the Court that they be pursued as to what

13  compensation is going to have in the production.

14                  THE COURT:  I think that's what this whole

15  settlement is about.  Am I misunderstanding where we are,

16  Mr. Searcy?

17                  THE WITNESS:  No.  You're correct.

18                  THE COURT:  Okay.  The settlement, as the

19  Court understands it, is that Mr. Searcy, in his capacity as

20  Trustee, has brought lawsuits against people who took assets

21  from these debtors without adequate compensation.  We call it

22  adequate consideration, legal ease.  And so they've reached

23  an agreement where they're going to give some things back to

24  the estates, the respective estates.  So that's exactly what

25  this lawsuit, this settlement is about is reaching an

1  agreement about what's going to happen, given these causes of

2  action that the estate has.  Okay?

3      All right.  Did you have any other questions for this

4  witness?

5              MR. WATKINS:  Uh --

6              THE COURT:  I'll hear you on closing at the

7  end.  But if you have a question for the witness, an

8  evidentiary matter, you can ask it now.  Otherwise, you need

9  to wait until we get to the closing.

10             MR. WATKINS:  Thank you.

11             THE COURT:  Thank you.

12     All right.  Yes, ma'am.  Did you have a question for

13  this witness?

14     Okay.  I need you to state your name for the record

15  first.

16             MS. DOW:  Janet Dow.

17             THE COURT:  And what is your interest in this

18  case, ma'am?

19             MS. DOW:  I'm representing the Dow Living

20  Trust, general partner.

21             THE COURT:  Okay.  You can't represent --

22             MS. DOW:  I'm a Trustee.

23             THE COURT:  Okay.  You still can't represent

24  other parties in this case, unless you're a lawyer.  Are you

25  a lawyer?

1          MS. DOW:  No.  I'm just a Trustee of this

2    trust.

3          THE COURT:  Okay.  Is it your trust?

4          MS. DOW:  Yes.

5          THE COURT:  Okay.  I'll let you ask some

6    questions.

7              <u>CROSS-EXAMINATION</u>

8    BY MS. DOW:

9      Q.    So, it's been indicated that we would be liable,

10    the general partners would be liable for debts.  Does this

11    agreement that we're working on today, or hoping to get

12    through, does that relieve us from this liability?

13     A.    No.

14     Q.    So why would we want to do it?

15          MR. HAMM:  Your Honor, objection.

16          THE COURT:  OBjectio sustained.

17     Q.    Okay.  And you said that you will hire someone, or

18    get someone to sell our -- sell the wells, the three wells?

19     A.    Yes.

20     Q.    So how do we have assurance that we will have a

21    reputable, knowledgeable company that will do this?

22     A.    I have to file a motion with the Court.  And the

23    judge has to approve the retention of anyone who will do the

24    marketing.  And any of you that don't want them to do it,

25    have the right to object, if you want to.  And when they find

1   a purchaser, I will also file a motion to approve the sale,

2   showing what the amount of the sale price is.  And, again,

3   any interested party that wants to can file an objection and

4   present their issue to the Court with what they think is

5   being under sold.

6        Q.   So we get notice of all these things?

7        A.   I assume you do.  I don't know if you've appeared

8   in my cases are not.  And, I assume, Mr. Moser can give

9   notice to everyone who has appeared in his case.  So we can

10  try to get notice out to everyone.

11       Q.   Okay.  Are they required to, or we're just hoping

12  to --

13       A.   I'm required to give notice to everybody in my

14  case.  And it's a little bit unusual, because we're actually

15  selling two different interests.  Mr. Moser is here.  You

16  could ask him.  But I suspect he will send the same thing

17  notice out in his case.

18       Q.   Okay.  And did I understand you to say that you

19  felt at this time that the wells were worth between 600,000

20  and $1.5 million?

21       A.   I think that's probably where the market is.

22       Q.   Is that per well, or total?

23       A.   That's total.

24            THE COURT:  Just so I understand, Mr. Searcy.

25  Is that the debtors' interest in the wells, or is that what

1   the total value of the wells are?

2              THE WITNESS:  That is all of the working

3   interest in two of the wells.  There's a small working

4   interest owned by someone else in one of the other wells.

5   But that will be all of the debtors' interest in those

6   properties.  And it's only worth that much because we can get

7   the operations with it and people will pay more when they can

8   control the wells.

9              THE COURT:  All right.  Thank you.

10      Q.   So the transfer of the interest from Maricopa to

11   the investors, I had thought that had already been decided.

12   Has that been decided, or is that what we're doing today?

13              MR. HAMM:  Objection.  I'm not sure what she's

14   asking?

15              MS. DOW:  Well --

16              THE COURT:  All right.  I need you to speak

17   into the microphone.  Because if you don't speak into the

18   microphone, we don't pick you up.  Okay?

19              MR. HAMM:  Yes, Your Honor.

20              THE COURT:  Thank you.  So you have a question

21   about the procedure, ma'am?

22              MS. DOW:  Well, it was my understanding -- you

23   know, we thought that the interest had been transferred to

24   the general partners.  Someone told me.  I don't know.  I

25   read it somewhere that that was -- because they were

1   insolvent at the time, Maricopa was insolvent.  That that was

2   thought to be fraudulent, so it wasn't actually --

3               THE COURT:  Okay.  Is there a lawsuit against

4   the general partners that's being settled today?

5               THE WITNESS:  No.

6               THE COURT:  Okay.  Does that answer your

7   question?

8               MS. DOW:  No.  But, I'm sorry, I probably

9   can't -- didn't make it clear and don't know how else to do

10  that.

11     Q.   Okay.  So I'm also curious about why Maricopa would

12  get 55 percent, when they didn't pay anything for the wells?

13              MR. HAMM:  Your Honor, objection.

14              THE COURT:  Objection sustained.

15     Okay.  Let me kind of tell you where we are, okay,

16  because I know that there are many people here who are

17  non-lawyers and they're kind of here and have a lot of

18  questions.

19     If you have legal questions, you need to address them

20  to your own lawyers.  Right now what we're doing is we are

21  taking evidence that is related to the settlement that's

22  before the Court and the Court's decision on whether oto

23  approve the settlement or not.  Okay?  So what I'm allowing

24  at this point in time is for the parties, interested parties

25  to illicit any evidence they wish to, that's related to the

1   settlement that's before the Court.  Okay?  This is not the

2   time nor the place for you to be addressing legal questions

3   to a witness.  Okay?  If you have legal questions about, you

4   know, how your rights are affected, what obligations and

5   potential liability you have as a general partner, or your

6   trust has as a general partner.  Those are all questions that

7   you should be addressing to a lawyer.  And I would highly

8   recommend that you do exactly that.  Okay?

9              MS. DOW:  Thank you.

10              THE COURT:  All right.  So did you have any

11   questions for the witness that is related to the matter

12   before this Court and that is evidentiary in nature?  So you

13   can't ask him a question to advise you about legal matters.

14              MS. DOW:  That's everything.

15              THE COURT:  Okay.

16        Any other cross?  Any redirect?

17              MR. STRAND:  One question.

18              THE COURT:  Hold on.  Apparently we have

19   another cross.

20        All right.  If you would state your name for the

21   record, sir.

22              MR. STRAND:  My name is Phillip Strand.  And I

23   am representing myself and my wife, Anita Strand.

24              THE COURT:  Okay.  You can represent yourself.

25   You can't represent somebody else.

1          MR. STRAND:  We are a three well LP.

2          THE COURT:  Okay.

3          MR. STRAND:  I have a question for Mr. Searcy

4   on the ownership.

5                    <u>CROSS-EXAMINATION</u>

6   BY MR. STRAND:

7     Q.   I believe I heard you say that the ownership of

8   these wells is assigned to Maricopa, because they owned the

9   leases.  But then what was the purpose of our investing, if

10  we didn't own these after it was all completed, which is what

11  was supposed to happen that we were informed?

12          MR. HAMM:  Your Honor, objection.  I'm not

13  sure this witness can testify about the purpose for their

14  investments I the limited partnerships.

15          THE COURT:  Okay.  Objection sustained.

16      I'm sustaining the objection.  Did you have a different

17  question for the witness?

18    Q.   Well, did I hear that correctly, that they did not

19  transfer -- they transferred from us back to Maricopa, as

20  part of the settlement?

21    A.   What the settlement does, the suit says that

22  Maricopa transferred the properties to the two limited

23  partnership.  And that it should be avoided, because it was a

24  fraudulent transfer on the law, because there was no

25  compensation paid to Maricopa, et cetera.  What we are

1  settling is that those properties will be re-transferred back

2  to Maricopa from the limited partnerships and that Maricopa

3  will then sell them.  And then the proceeds from the sale

4  will be divided 55 percent/45 percent.

5       Q.   But a fraudulent transfer?

6       A.   Yes.

7       Q.   On whose part?

8       A.   Well, it's a fraudulent transfer, we alleged, was

9  committed by the limited partnership agreements.

10       Q.   I have one more question.  Who was a part of all

11  the negotiations between the Trustees who have come up with

12  this compromise or settlement?  Was it strictly yourself and

13  Mr. Moser, or was there any representation from any of the

14  limited partners?

15       A.   It was the two Trustees and their counsel.

16       Q.   Thank you.

17            MR. STRAND:  Thank you, Your Honor.

18            THE COURT:  Thank you.

19        Anything further?  Any redirect?

20            MR. HAMM:  One question, Your Honor, on

21  redirect.

22            THE COURT:  You may proceed.

23            MR. HAMM:  Thank you.

24

25                 (no omissions)

1 <u>FURTHER REDIRECT EXAMINATION</u>

2 BY MR. HAMM:

3    Q.   At some point during your direct testimony,

4 Mr. Searcy, you had referenced that JMW or its predecessor,

5 potentially had a judgment against Maricopa.  Does JMW have a

6 judgment against Maricopa?

7    A.   No.  JMW, or its predecessor, has a judgment

8 against the Griffins and Payson Petroleum.

9    Q.   Thank you.

10            MR. HAMM:  No further questions, Your Honor.

11            THE COURT:  All right.  Thank you.  The

12 witness may step down.

13    Did you have any other evidence you wished to present,

14 sir?

15            MR. HAMM:  No, Your Honor.

16            THE COURT:  Thank you.

17    Mr. Harvey, any evidence you wish to present?

18            MR. HARVEY:  Yes, ma'am.  I call Mr. Chris

19 Moser to the stand.

20            THE COURT:  Mr. Moser, if you'll step forward

21 and be sworn.

22            (The witness was sworn by the courtroom deputy.)

23

24

25            (no omission)

1                    <u>CHRIS MOSER</u>

2    The witness, having been duly sworn to tell the truth,

3    testified on his oath as follows:

4                    <u>DIRECT EXAMINATION</u>

5    BY MR. HARVEY:

6         Q.   Mr. Moser, would you state your full name for the

7    Court and the record.

8         A.   Christopher Moser.

9         Q.   And how are you related to Petroleum 3 Well, LP?

10        A.   I am the Chapter 7 Trustee.

11        Q.   And when, approximately, were you appointed as the

12   Trustee?

13        A.   In January of 2017.

14        Q.   And how are you related to the Payson Petroleum 3

15   Well 2014, LP?

16        A.   I'm the Chapter 7 Trustee.

17        Q.   Before we get into this, I noticed from some of the

18   questions that we've had that people aren't quite

19   understanding your role here.

20         Could you tell them what a Chapter 7 is and what a

21   Chapter 7 Trustee does?

22        A.   Chapter 7 is the Chapter of the Bankruptcy Code

23   designed to liquidate the assets of the debtor.  So my charge

24   is to liquidate the assets of the debtor, if it's in the best

25   interest of the estate.

1      Q.   All, right.  You didn't file these Chapter 7s, did

2  you?

3      A.   I did not.

4      Q.   In fact, you were appointed by the Court as the

5  Chapter 7 Trustee, or by the U.S. Trustee's Office; is that

6  correct?

7      A.   That is correct.

8      Q.   And when you took over these two Chapter 7s, what

9  were the assets of the estates?

10      A.   Well, when I took them over, first of all, there

11  were no books and records, zero.  No bank statements.

12  Whatever I got, I had to get through subpoenas.  But as far

13  as assets, I found out there was $37 in one bank account

14  after subpoenaing, and $45 in another account.  In addition,

15  my estates owned interest in the three wells we're talking

16  about today.

17      Q.   All right.  And could you tell the Court

18  approximately what the secured/unsecured claims are in these

19  two estates?

20      A.   In my case -- well, I can tell you what's been

21  filed.  But in my case, the biggest creditor right now are

22  the property taxes.  The ad valorem property tax creditors

23  right now filed claims for about $200,000, which is at a pace

24  of about $100,000 a year of property taxes.  So in January,

25  another $100,000 clicks on.  And then the other creditors

1  that we have -- that's a secured creditor that's filed a

2  claim in my case.  I have the Comptroller.  Some unsecured

3  creditors and maybe six limited partners/partners/ have filed

4  claims in my cases.

5       Q.   Do you also have some mechanic lien files?

6       A.   They haven't been filed.  But I know there are

7  mechanic liens of record.  They don't have to file.

8       Q.   Okay.  Are you familiar with the settlement we're

9  attempting to approve today?

10      A.   I am.

11      Q.   And you hired -- you asked me to represent you in

12 the litigation around late January or early February; is that

13 correct?

14      A.   That is correct.

15      Q.   And I took this case on at an hourly rate; is that

16 correct?

17      A.   Yes, you have.

18      Q.   And you have no money in the estates and so,

19 basically, my firm has footed the bill for this litigation;

20 is that correct?

21      A.   You have.  And it's pretty abnormal in a situation

22 like this, because this -- I'm defensive.  Usually a Trustee

23 is on offensive litigation.  So finding a lawyer to represent

24 you when you're being sued is much harder than trying to find

25 one when you're trying to recover money.  But you did step up

1    to the plate and you've incurred attorney's fees in the

2    process.

3         Q.    And my attorney's fees, as of the end of September,

4    was approximately $22,000; is that correct?

5         A.    That was my understanding, 22,000.

6         Q.    And, frankly, through this, we've done the

7    litigation, we've been in the early stages and we haven't

8    really got involved in the really complex issues of

9    valuation, taking depositions, et cetera, et cetera.  So do

10    you anticipate that these costs will probably get greater?

11         A.    Oh, absolutely.  If this thing goes to trial, I

12    would agree with Mr. Searcy.  We're talking another 100 to

13    another $175,000 of professional fees in some fashion or

14    another my estates will incur, if I can find somebody to do

15    it.  That's the challenge.  I understand that you're running

16    out of gas on this case.

17         Q.    Okay.  Have you reviewed all of the documents in

18    this case?

19         A.    The ones I've seen.  I can tell you I've reviewed

20    documents in this case.  I don't know if they are all.

21         Q.    And the case is quite complex; is it not?

22         A.    It is.  It involves investor fraud, SEC issues, et

23    cetera.

24         Q.    And the SEC is involved in this case; is that

25    correct?

1    A.    Well, to the extent that the owners of this company

2  have agreed to judgments in favor of the SEC for investor

3  fraud.

4    Q.    And did we have a lot of cooperation from the

5  principals of this case?

6    A.    Zero.

7    Q.    In fact, we couldn't get them to talk to us, could

8  we?

9    A.    The only people I've been able to talk to are

10 either investors, promoters, creditors.

11   Q.    When we first set down with Mr. Searcy to discuss

12 settlement, what was the first offer we received?

13   A.    Well, it was an insulting $50,000.

14   Q.    You kind of said it was nuisance money, right?

15   A.    Right.  That was the view.

16   Q.    Now, you heard Mr. Searcy's testimony as to the

17 terms of the proposed compromise; is that correct?

18   A.    That is correct.

19   Q.    And do you agree with that interpretation?

20   A.    He said it very well.

21   Q.    And that -- is that set forth in the terms of the

22 proposed compromise?

23   A.    Right.

24   Q.    And do you feel that was a good deal for the

25 estate?

1      A.    Considering everything that's going on in my case,

2  I think it is a very good deal.  It's in the best interest of

3  the unsecured creditors of my case.

4      Q.    If everything goes as planned and they sell the

5  asset for approximately the amount that we're discussing,

6  will there be monies to pay the taxes, the unsecured claims,

7  et cetera, in your case?

8      A.    I'm very hopeful the property taxes will be paid

9  from the sale.  If the sale nets the minimum 600,000, I would

10  thin that the first 300 or so would go to the property taxes.

11  That would be my guess.  Above that, what's going to be the

12  play in the case is how these M&M, mechanic and materialman's

13  liens that are filed, how avoidable they are and what happens

14  to the judgment liens.  And if that all plays out favorably,

15  my estate will get something in excess of the property tax

16  money to pay to unsecured priority creditors, which include

17  the Comptroller of the State of Texas and hopefully something

18  to general unsecureds.

19      Q.    And have we told the limited partners if they want

20  to make an offer to buy these assets, we would certainly

21  entertain that?

22      A.    To the extent I've spoken to them, or you have.

23      Q.    Do you agree, approximately with the value that

24  Mr. Searcy testified to?

25      A.    I have no reason to dispute it.  He has much, much

1   more experience in oil and gas sales than I do.  Like I said,

2   he sold over 50 of these type of interest before.

3       Q.   If the Court denies this settlement and litigation

4   proceeds and you lose, do you think that there might be a

5   likelihood that you might lose the case?

6       A.   This is one of the few cases that I can honestly

7   say I'd rather be on his side of the docket than mine.  And

8   so I think there is risk, substantial risk.

9       Q.   Okay.  And if you were to lose, what would the

10  creditors of your estates get?

11      A.   Zero.

12      Q.   Were you able to put any kind of monetary, not

13  monetary, numeric value to the chances that we would win on

14  all of the issues?

15      A.   It's under 50 percent.  That's the reason for the

16  split.  I think I got a pretty good deal, given my risk and

17  benefits, et cetera, of litigating this.

18      Q.   Assuming for a moment that you were able to win

19  this litigation and you were able to operate these wells, can

20  you as a Chapter 7 Trustee operate these wells?

21      A.   I need a license or someone to operate them for me.

22  No.

23      Q.   As a Trustee with quite a bit of experience, do you

24  think this settlement falls within the reasonableness

25  standard for both estates?

1      A.   I think it's very reasonable for my estate.

2      Q.   Do you think it's fair and equitable and in the

3  best interest of your estate?

4      A.   On behalf of my estate, yes they are, it is.

5      Q.   And as far as the complexity of this case, I

6  started working on this in February and it's like German.   It

7  keeps slipping out of my mind.   There's so many issues to

8  this case and so many -- the Griffins did so many bad things

9  that keep popping up.   I find this case very complex.   Do you

10  agree with me?

11      A.   I would agree completely.   Any time you have a

12  fraud case, it adds another layer of difficulty.   And that is

13  exactly what this case is.   And investors have been given a

14  bad deal in this case.

15             MR. HARVEY:   Pass the witness, Your Honor.

16             THE COURT:   Thank you.

17      Cross?

18             MR. REED:   A few questions, Your Honor.

19             THE COURT:   All right.

20             CROSS-EXAMINATION

21  BY MR. REED:

22      Q.   Good morning, Mr. Moser.   As you know, I represent

23  JMW Recovery.   Just a few questions for you.

24      Is it your testimony that if you do not go forward with

25  this settlement, that you won't be able to keep counsel to

1  continue to defend it?

2      A.   That is my understanding.  In fact, I'm willing to

3  go so far as this exact litigation was the litigation that

4  the investors had before this case started.  They couldn't

5  fund it.  They couldn't do anything with it.  If this

6  settlement doesn't get approved, I'd be happy to have the

7  case dismissed and let them have it back, again, if they

8  think they can do a better job.

9      Q.   So if you don't get the settlement approved, that's

10  your plan?

11     A.   It's not my plan.  But you just asked me how I feel

12  about it.  That's the way I feel about it right now.  I'd

13  talk to Mr. Harvey.  But that is a consideration I would

14  strongly consider.

15     Q.   And you said your chances at success were less than

16  50?

17     A.   Right.

18     Q.   But you're splitting all of the claims 50/50,

19  right?

20     A.   Right.

21     Q.   And you couldn't continue, if the case continued.

22  What did you value the well interest at?

23     A.   I would agree with Mr. Searcy, between 600 and 1.5

24  million.

25     Q.   And did you have any independent value done, or did

1  you just agreed with your opposing party?

2       A.   That, plus we have the operator here, who I've

3  talked to.

4       Q.   And the operator didn't testify as to a value for

5  the wells, correct, she only testified as to the revenue

6  that's been received, right?

7       A.   In court.  But as to me, I've spoken to her.

8       Q.   She's offered no testimony here?

9       A.   Correct.

10       Q.   And so anyone else that you've had value the well

11  interest?

12       A.   I've tried -- I hired a valuation expert, but he

13  couldn't get any documents on the value of the wells, other

14  than income.

15       Q.   Who did you hire?

16       A.   Mr. Dolmeyer.

17       Q.   And so he didn't provide a value, because he

18  couldn't --

19       A.   He did not.

20       Q.   Did you value the claims that you're selling?

21       A.   The 723 claims?  Which claims?  My defensive claims

22  or offensive?

23       Q.   Let's talk about your defensive claims first.

24       A.   Yes.  That's the one I think I have less than 50

25  percent chance of --

1     Q.    Okay.  And so you put a monetary value on those

2  claims?

3     A.    Defensive litigation?

4     Q.    Yes.

5     A.    Not losing it?  I think I would lose it.  I would

6  lose the assets is my conclusion.

7     Q.    And how about your offensive claims?

8     A.    They are general partner claims that right now I

9  don't know what they are worth right now.  They're 723.  The

10  general partners could possibly owe money to the estate for

11  the unpaid funds.  And we'll just have to valuate that on a

12  case-by-case basis, which we have not done yet.

13     Q.    So no investigation has been done on those claims,

14  right?

15     A.    Well, I know that they're there.  But as far as the

16  collectibility, that lawsuit has not been brought.  And this

17  has been the pressing issue on the case.

18     Q.    You said the first offer was for $50,000.  That was

19  in exchange for transferring the assets?

20     A.    Giving up.  I'm done.  Take the assets back and

21  I'll give you $50,000.  And I close my case and game over for

22  me.  I pay the creditors whatever they get.

23              MR. REED:  Nothing further, Your Honor.

24              THE COURT:  Okay.  Anything else for this

25  witness?

1          Thank you.  The witness may step down.

2          Any other evidence you wish to present, Mr. Harvey?

3                    MR. HARVEY:  No, Your Honor.

4                    THE COURT:  Thank you.

5          Any other evidence any other party wishes to present?

6          All right.  I'll hear closing, then.

7                    MR. HAMM:  Your Honor, short closing.

8                    THE COURT:  Thank you.

9                    MR. HAMM:  We have the evidence that's been

10  presented through the testimony of Ms. Merritt, Mr. Searcy,

11  and Mr. Moser has explained to the Court why the factors that

12  the 5th Circuit considers when evaluating settlements have

13  been met.  The assets at issue, in particular the oil and gas

14  wells, are valued at somewhere between, we believe, 600,000

15  and 1.5 million, plus the 600,000 in suspended revenues.

16  Combined, the Trustees have explained that they believe that

17  continued litigation will reduce the amount available to

18  creditors from those proceeds by another 400,000.

19          Both sides have expressed that they believe that this

20  settlement is in the best interest of their creditors,

21  because it allows the estates to get off high center,

22  liquidate assets, which could be used, hopefully, to provide

23  a recovery to even unsecured creditors in their cases.

24          For those reasons, we believe that the settlement

25  factors have been met, at least the ones set forth in the 5th

1   Circuit that have been identified as Jackson Brewing or

2   Foster Mortgage factors.

3        Regarding the objections asserted by JMW, Your Honor.

4   JMW's objection, although I'm not sure it was substantive,

5   was based on the fact they did not believe, or that creditor

6   did not believe that sufficient numbers regarding valuation

7   of the assets at issue have been presented and, therefore,

8   they could not evaluate whether or not to object to the

9   settlement.

10       Your Honor, both Trustees have explained today that the

11  only real value they know is the $597,000 that's held in

12  suspense.  The value of the wells won't be determined.  The

13  value of the sales value of the wells won't be determined

14  until the sale is concluded.  The value of the claims that

15  are being granted in the various cases can't be determined

16  until those cases are closed.  And the value of the potential

17  avoidance actions and the proceeds from the potential

18  avoidance action and partnership claims that would be

19  exchanged in the settlement simply can't -- that value can't

20  be determined right now, because there are numerous facts

21  which haven't even been addressed.  Those cases haven't been

22  initiated.  Litigation hasn't been initiated.  And, in large

23  part, whether or not claims against general partners of these

24  partnerships have any value, depends upon a short fall in

25  those partnership cases with regards to assets.  What allowed

1  claims aren't paid in those cases.

2      Regarding the partner claims themselves, Judge.  I
3  think that the Court should overrule those objections for
4  numerous reasons.  Perhaps the most important reason is that
5  it's the partners, themselves, who in their own objections
6  admit that they placed these partnerships voluntarily into
7  Chapter 7 bankruptcy upon the advice of their attorney,
8  because they did not want to fund the defense of Mr. Searcy's
9  litigation.  They wanted a Chapter 7 Trustee to do that for
10  them.  As a result, I think it's highly likely that this
11  settlement provides a better value to the estates, the
12  limited partnerships than the partnerships would have
13  obtained for themselves outside of bankruptcy.  If they were
14  incapable of funding the litigation and had not filed for
15  bankruptcy, it's quite possible that Mr. Searcy would have
16  already obtained judgment by now, either through default, or
17  summary, or otherwise, if the claims weren't being defended.

18      Due to Mr. Moser's intervention, as the Chapter 7
19  Trustee, these estates will obtain approximately 45 percent
20  of whatever value there is in these oil and gas properties.
21  Moreover, I believe it was Mr. Moser's testimony that it is
22  unlikely that, in any event, equity in those cases would
23  receive a recovery.  So for these reasons, Your Honor,
24  Mr. Searcy requests that you approve the joint motions to
25  approve the settlement and approve the settlement agreement.

1          Thank you.

2                    THE COURT:  Thank you.

3                    MR. HARVEY:  Your Honor, Mr. Moser would ask

4     the Court to approve the settlement agreement.  He believes

5     that it's in the best interest of the estate.  That is not to

6     say that we don't feel that the limited partners and general

7     partners got a very bad deal here and they were treated

8     horribly and they were defrauded.  But this happened a long

9     time before we went into the Chapter 7.  What we're faced

10    here with is the economics.  And we don't feel, unless these

11    properties sell for much higher value than was testified here

12    today, that the limited partners and the general partners

13    will receive anything in these cases.  And we would ask the

14    Court to approve the settlement.

15                   THE COURT:  Okay.  Does anyone else wish to

16    make a closing statement?

17                   MR. REED:  I do, Your Honor.

18                   THE COURT:  You may proceed.

19                   MR. REED:  Kendall Reed on behalf of JMW

20    Recovery.

21          I think the testimony here, Your Honor, that you've

22    heard --

23                   THE COURT:  Before you do, can you explain to

24    me, who is your obligor?  Who is your debtor?

25                   MR. REED:  My debtor is the Payson and

1    Maricopa entities, Your Honor.

2                  THE COURT:  But none of them are the debtors,

3    right?

4                  MR. REED:  Yes.

5                  THE COURT:  Which one?  Who -- which Trustee

6    is representing your debtor?

7                  MR. REED:  Mr. Searcy.

8                  THE COURT:  Okay.  Did you have a judgment --

9    I thought I understood that you had a judgment against, or

10   your predecessor had a judgment against the individuals.  Is

11   that not correct?

12                 MR. REED:  We had a judgment against the

13   individuals and Payson.

14                 THE COURT:  Okay.  Which Payson?

15                 MR. REED:  Payson Petroleum.  And then as part

16   of -- this was a hotly contested.  We went to trial.  Got a

17   judgment.  We're on appeal.  We ended up settling the case,

18   Your Honor, in which we were assigned interest in and have a

19   lien against Maricopa interest.

20                 THE COURT:  A lien against what interest?

21                 MR. REED:  Their properties in the --

22                 THE COURT:  I'm just trying to understand what

23   your interest is and how that affects your objection.  I just

24   want to understand that.

25           So Maricopa, you assert that you hold liens against

1   certain assets owned by Maricopa?

2              MR. REED:  Yes, Your Honor.

3              THE COURT:  Okay.  Are those assets currently

4   the property of the estate or property -- or is that property

5   that's been transferred to the Chapter 7 entities?

6              MR. REED:  I believe it includes the well

7   interest that have been transferred, Your Honor.

8              THE COURT:  Okay.  You have a lien on a well

9   interest how?

10             MR. REED:  As part of our settlement, Your

11  Honor.

12             THE COURT:  That's not my question.  Somebody

13  may have intended to give you some kind of interest in

14  something.

15             MR. REED:  Well, we have a deed of trust.

16             THE COURT:  A deed of trust --

17             MR. REED:  From Maricopa covering their

18  property.

19             THE COURT:  Was Maricopa one of your judgment

20  debtors?

21             MR. REED:  The -- it was not a judgment

22  debtor.  We had a fraudulent transfer claim that we were to

23  be pursuing against Maricopa, because during the pendency of

24  the trial and the judgment and the appeal, interest were

25  transferred from the individuals and Payson to Maricopa.

1          THE COURT:  Okay.  All right.  Now let me

2  understand your objection.

3          MR. REED:  Yes, Your Honor.  My objection is

4  that what the testimony of both Mr. Searcy and Mr. Moser

5  indicates is that they haven't done the work to value the

6  interest that are being traded back and forth.  Quite

7  frankly, from the testimony of Mr. Moser, this sounds like a

8  lopsided deal in favor of the LP or his interest, given his

9  testimony here today that he cannot defend the litigation.

10  Which, as a result, would have these interests without having

11  to give up any percentage of them coming into Mr. Searcy's

12  estate.

13      What the response to our objection of what we've heard

14  is that we haven't valued the claims.  We haven't valued the

15  interest.  We're guessing, based upon revenues as to what

16  they might be.  But we haven't solicited offers.  We haven't

17  done any reserve reports to know what we're actually

18  transferring here.  So I don't believe the Court, given that

19  evidence, could approve this settlement, because it does lack

20  the information as to what's being exchanged here.  And the

21  Court is in an interesting position having two different

22  bankruptcy estates here to balance, is it in the best

23  interest of both estates.

24      My objection, Your Honor, is that there hasn't been

25  sufficient evidence here to present it to the Court to

1  determine that this is in the best interest of the estates.

2  Thank you, Your Honor.

3              THE COURT:  All right.  Does anyone else wish

4  to be heard in connection with this matter?

5       You may approach.  I need you to state your name,

6  again, for the record.  And then you may proceed.

7              MR. WALKER:  My name is Jimmy Walker.  And I'm

8  one of the partners in the 3 Well, Payson Petroleum 3 Well.

9              THE COURT:  Are you a general partner or a

10 limited partner?

11             MR. WALKER:  I think I'm a limited partner.

12             THE COURT:  You hope.

13             MR. WALKER:  I hope.  And I would like to ask

14 a question of the Court, if you may.

15      I don't understand a lot of this.  But my main question

16 is, this settlement, does that end our liability, the

17 stockholders or investors in this?  I mean, I think we've

18 been defrauded about enough.  And it looks like to me at some

19 point we need to limit our liability here.  We don't need to

20 just keep on throwing money at this thing.  And I don't

21 understand, really, where we stand in this settlement.  Are

22 we still going to be liable?  Is Mr. Moser serving our best

23 interest to stop our liability, or Mr. Searcy?  I don't

24 understand this.  I don't really understand how we got into

25 this to start with.  How Griffin pulled us into this when we,

1    I thought, contributed $27 million or so to buy these wells.

2    And then we wind up finding out that we didn't ever own the

3    wells, or he never put any money into these wells.  But we

4    threw $27 million at this.  And we're still liable for debt.

5    I just can't understand any of this.

6                    THE COURT:  Okay.

7                    MR. WALKER:  Can you tell me what will stop

8    our liability?

9                    THE COURT:  Unfortunately I can't.  Okay.  I'm

10   not your lawyer.  I can't give you legal advice.  That's not

11   why this Court is here.  This Court is here to make some

12   decisions about whether this settlement should be approved.

13                   MR. WALKER:  Well --

14                   THE COURT:  Now, I would strongly suggest you

15   all visit with counsel outside of this courtroom, to

16   understand your rights.  But there seems to be a little bit

17   of a misconception by people about the Trustees and who they

18   represent.  Mr. Moser does not represent the individual

19   investors.  He does not represent the limited partners or the

20   general partners.  He is here simply as a Trustee of the

21   three debtor entities.

22       Is it three or two?  Two, I'm sorry.  I'm thinking

23   three over here.

24       And, likewise, Mr. Searcy is here as the representative

25   and Trustee for the other three debtor entities.  Okay?  They

1  don't represent you.  They're not here to represent you or

2  your interest.  Their job is to get in as much money as

3  possible into their respective estates.  And once that money

4  is there, then they distribute it, according to the aw.

5  Okay.  And investors in a limited partnership, for example,

6  is the last one to get paid, after all creditors are paid.

7  So on the ladder of priorities, you all are sort of at the

8  bottom.  Okay?  And if there's money to pay you all, there

9  will be money to pay you all.  But there's no obligation --

10 there's no representation by Mr. Moser, in his capacity as

11 Trustee, to represent you and your interest.  That's why you

12 have to get your own lawyers and understand what your

13 obligations are.  And I would highly recommend you all do

14 that, everybody.

15            MR. WALKER:  I think most of us haven't hired

16 lawyers or talked to a lawyer, just simply because we have

17 gotten very little information.  I know I have gotten very

18 limited information.  I didn't even know how much money was

19 still in the accounts, or anything.

20            THE COURT:  Well, now you know.

21            MR. WALKER:  Yes.  But, you know, I don't know

22 why some of these Trustees or someone hasn't been giving us

23 any information.  And we haven't gotten any information from

24 them.  But right now, I understood that I invested in a

25 limited liability partnership.  So when is my limited

1  liability going to kick in?  I mean, can I be personally sued

2  or something for debt?

3              THE COURT:  Again, I cannot represent you.  I

4  am not your lawyer.  Okay?

5              MR. WALKER:  I understand.

6              THE COURT:  There was a time, more than 15

7  years ago, where I could have.  But I can't.  I just can't

8  ethically do that.  And that's not where I'm at today.  You

9  wouldn't want a judge who is in the middle of judging issues

10 between different parties to take sides for somebody else and

11 tell them, This is what you've got to do and this is how

12 you're going to do it.  Right?  There's a reason I'm the

13 judge.  And I can't do that for you.  Okay?  But I would

14 certainly encourage you to talk to Mr. Moser and Mr. Searcy

15 about their intentions with respect to limited partners.  I

16 think they can tell you what they intend to do, or what they

17 understand they can do, which I assume isn't much.

18      Am I misunderstanding, Mr. Moser?

19             MR. MOSER:  My understanding is he's a general

20 partner.

21             THE COURT:  Okay.  That he is a general

22 partner?

23             MR. MOSER:  Correct.

24             THE COURT:  Okay.  All right.  So --

25             MR. WALKER:  Well, until Monday, I didn't even

1  know who these people where.

2              THE COURT:  Right.  Okay.  Well, I'm sorry

3  about that.

4              MR. WALKER:  That was the first (inaudible

5  word) I got.

6              THE COURT:  Certainly.  I'm sorry about that.

7  But I'm just telling you, you need a lawyer.  Okay?  If

8  there's any potential of additional liability, you need a

9  lawyer.  And if you choose not to have a lawyer, then there

10 are risks associated with that and you're choosing to take

11 that risk, too.  The choice is your's.  But at the end of the

12 day, I can't give you legal advice.  Okay?  Thank you.

13             MR. WALKER:  Well, I'm sure the lawyer is

14 going to ask me for information and I don't really have any.

15             THE COURT:  All right.  Thank you.

16             MR. WALKER:  Thank you, Judge.

17             THE COURT:  Does anyone else wish to present

18 any closing arguments?

19      Yes, sir.

20             MR. SMITH:  Mark Smith, general partner in the

21 3 Well.

22             THE COURT:  Yes, sir.

23             MR. SMITH:  One thing that I haven't heard yet

24 today is how it is that the partnership should have liability

25 to pay creditors, when they didn't hire the creditors, Payson

1  did.

2            THE COURT:  Okay.  Which Payson entity are you

3  talking about?

4            MR. SMITH:  Has anybody got an answer to that?

5            THE COURT:  Okay.  First of all, I can't give

6  you legal advice.

7            MR. SMITH:  Does anybody want to comment?

8  Because I think the partnership deserves to understand how

9  they're being asked to have liability.  They never hired the

10  creditors.  So why should they pay those bills?  It's Payson

11  that filed and Payson that hired them.  And if the 579 or

12  97,000 that's in funds was made available to the partnership,

13  which should be, there would be money for litigation.

14            THE COURT:  Which partner ship are you talking

15  about?

16            MR. SMITH:  The 3 Well -- this whole

17  proceeding.  The 3 Well --

18            THE COURT:  There are multiple partnerships,

19  some of --

20            MR. SMITH:  But the limited partners that

21  invested in whether it be the 3 Well, or the 2014 3 Well, if

22  Payson hired the creditors, shouldn't they be liable on that

23  side to pay the creditors, not the partnership, because the

24  partnership didn't hire them?

25            THE COURT:  Well, you can go talk to your

1   lawyer about that.

2                    MR. SMITH:  I mean, there's some out here

3   representing us --

4                    THE COURT:  They're not representing you.

5   They're not representing you.  And if you want to have a

6   discussion, you can have a discussion --

7                    MR. SMITH:  I just wonder if they can clarify

8   to those in the courtroom --

9                    THE COURT:  Well, claims in bankruptcy will

10  get allowed as they get allowed.  If you have an objection to

11  some claim that gets filed in any one of the respective

12  entities, because you believe that particular entity doesn't

13  owe the money, you can object.  Okay?  And if you think it's

14  the wrong -- the claim is being asserted against the wrong

15  entity, you can object to that claim.  But, again, I can't

16  give you legal advice.  And they're not here to give you

17  legal advice.  And we're not --

18                    MR. SMITH:  Well, I'm not asking for advice.

19  I'd just like somebody to answer the question.

20                    THE COURT:  We're not making any decisions

21  about the allowability of claims.  Those claims will be

22  determined in connection with any claims objection processes.

23  And you can object.  If there's a claim that you think is

24  being asserted against the wrong entity, you are more than

25  welcome to object, if you have standing to do so.  Okay?

1          MR. SMITH:  Will that be too late after

2    today's decision is made?

3          THE COURT:  No.  You can object to claims.

4    Thank you.

5       Yes, ma'am.

6          MS. DOW:  Janet Dow.

7          THE COURT:  Yes, ma'am.

8          MS. DOW:  I hate to keep asking questions.

9    But my question is, who are the three debtors that they

10   represent?

11         THE COURT:  Payson Petroleum, Inc; Maricopa

12   Resources, LLC; Payson Operating, LLC.

13      Did I mis-state those three entities?

14         MALE SPEAKER:  That's correct, Your Honor.

15         MS. DOW:  Thank you.

16      And then who are the two that --

17         THE COURT:  Payson Petroleum 3 Well, LP;

18   Payson Petroleum 3 Well 2014, LP.

19         MS. DOW:  Thank you.

20         THE COURT:  Thank you.

21         MR. HARVEY:  Your Honor, may I make a

22   suggestion?

23      Mr. Hamm did a really good job in creating a response

24   to the objections.  It's about 20 pages long.  It sets out

25   the facts of the case.  It shows the dates that the transfers

1  were made.  It shows even though they invested X number of

2  dollars, those assets didn't go where they think they went.

3  And if they would read -- and they got copies, I think.  They

4  were sent copies of that comment.  And if they would read

5  that, they would understand what happened to them in this

6  case.

7              THE COURT:  Okay.  Thank you.

8       And I'd highly encourage you all to take that to your

9  lawyer.  I think that it's -- if you don't have enough facts,

10  that will certainly give your lawyer other places to start to

11  understand what's going on.  Okay?

12      All right.  Any other closing arguments?  Anything

13  further from any of the parties?

14       Mr. Hamm?

15              MR. HAMM:  No, Your Honor.

16              THE COURT:  Thank you.

17      Okay.  All right.  Before the Court is the motion to --

18  is a joint application for approval of compromise and

19  settlement agreement between the Chapter 11 estates of Payson

20  Petroleum, Inc; Maricopa Resources, LLC; and Payson

21  Operating, LLC through the Trustee, Jason Searcy on the one

22  hand, and then Payson Petroleum 3 Well, LP and Payson

23  Petroleum 3 Well 2014, LP, their respective Chapter 7 estates

24  represented by Christopher Moser, as the Chapter 7 Trustee.

25       Having reviewed the joint application and the evidence

1   before the Court, and having heard arguments today, and the

2   comments and evidence presented, the Court finds and

3   concludes that the Court has jurisdiction over this matter

4   pursuant to 11 USC Section -- I'm sorry, 28 USC Section 1334.

5   The Court further finds that this is a core matter, as to

6   which this Court has the authority to enter a final judgment,

7   or final determination.

8          In connection with a settlement, a Bankruptcy Court

9   should approve a settlement under Bankruptcy Rule 9019, if

10  the settlement is within a range of reasonableness fair and

11  equitable, and in the best interest of the bankruptcy estate.

12  Jackson Brewing Company, 624 F.2d 599 at 602; US versus

13  Aweco, In re Aweco, 725 F.2d 293 at 298, 5th Circuit, 1984.

14  In making that determination, a Bankruptcy Court must make a

15  well-informed decision comparing the terms of the compromise

16  with the likely rewards of litigation.  The Court must

17  evaluate what the probability of success in the litigation

18  with due consideration for the uncertainty in fact and law to

19  the complexity and likely duration of the litigation and any

20  attendant expenses, inconvenience, and delay and all other

21  factors bearing on the wisdom of the compromise.

22         Under the first factor, the Court does not conduct a

23  mini trial, but the Court does apprise itself of the relevant

24  facts and law to make an informed decision.  See River City

25  versus Herpel; In re Jackson Brewing Company, 624 F.2d 599 at

1  602, 5th Circuit, 1980.

2       Under the third category, the Court should consider the

3  best interest of creditors with proper deference to their

4  reasonable views.  See In re Cajun Electric Power Coop, Inc,

5  119 F.3d 349, at 356, 5th Circuit, 1997.  In the context of

6  settlement litigation, In re Protect A Committee for

7  Independent Stockholders of TMT Trailer Ferry, Inc, versus

8  Anderson, 390 US 414, 1968.  The Supreme Court mandated that

9  a Bankruptcy Court in considering whether to approve a

10  compromise should apprise itself of all facts necessary for

11  an intelligent and objective opinion of the probabilities of

12  ultimate success, should the claim be litigated.  Further,

13  the judge should form an educated estimate of the complexity,

14  expense, and likely duration of such litigation, the possible

15  difficulties in collecting on any judgment which might be

16  obtained, and all other factors relevant to a full and fair

17  assessment of the wisdom of the proposed compromise; id at

18  424.

19       Here, it appears that the Chapter 11 debtors, on the

20  one hand, and the Chapter 7 -- and the related Chapter 7

21  debtors in this case have been involved in multiple

22  pre-petition transactions by insiders without proper regard

23  to corporate formalities.  And without regard to the

24  respective fiduciary duties those insiders owe to the

25  different entities involved in this bankruptcy case.  It

1   appears that the principals may have left not only this

2   estate, but the investors in a quagmire that cannot all be

3   resolved by this Court.  But this Court can, at least,

4   address the issues between the respective estates before the

5   Court today.

6          The Court is familiar with Mr. Searcy, in as much as he

7   practices regularly before this Court and serves as Chapter

8   11 Trustee in other cases.  And based on the evidence before

9   the Court, the Court accepts the valuation proposed by --

10  opined on by Mr. Searcy.

11         Further, the Court notes that under 9019, it is not

12  incumbent on an estate to achieve the best possible result in

13  connection with the settlement, as long as the settlement

14  falls within a range of reasonable results.  Given the

15  economics of this case, given the facts of this case, and it

16  further appearing that there was some disputes about

17  consideration, about solvency, and other issues, it appears

18  to the Court that this settlement falls within that

19  reasonable range of results and is in the best interest of

20  both estates, or I guess all five estates to approve the

21  settlement and compromise.  The Court will, therefore,

22  approve the motions.

23         The parties will upload a form of order that is

24  consistent with the Court's ruling.

25         Now, aside from the ruling, I want to make sure

1   everybody in this courtroom understands what we're doing

2   here.  All we're doing is settling the lawsuits and the

3   causes of action between the respective estates.  It does not

4   release non-parties to the settlement from whatever

5   obligations they may have.  It does not create obligations

6   that they don't have.  If the estates have claims against you

7   for something, like against general partners, those issues

8   still remain.  If they don't have claims against you because

9   you are a limited partner or don't otherwise have liability,

10   the settlement doesn't create obligations.

11       I believe, based on the evidence the Court has seen in

12   this case and the testimony of the respective parties, I

13   don't believe there's going to be any funds available in any

14   of the estates to make distributions to investors.

15       Am I mistaken in that understanding, gentlemen?

16       Okay.  So I guess the reality is, based on the funds

17   that are available, investors are not going to see money from

18   these estates, because there's not enough money to pay the

19   creditors.  As I understand it, there was at least a $5

20   million haircut that took place not too long before

21   bankruptcy, because the well did not -- for whatever reason,

22   I don't know if it was a dry well, or they just didn't

23   complete it, but there was no money flowing from that well.

24   And there was a lot of money that's owed.  But at the end of

25   the day, there's not going to be any money from the

1   bankruptcy estates to you, if you're an investor.  If you are

2   a creditor, that's different.  Because it depends on what

3   priority you have and what secured claims you have in all of

4   those issues.  If you have liability, especially if you're a

5   general partner personally, there may be some issues there.

6   And I think the Trustees have indicated they're going to be

7   looking at those and at least have some interest in pursuing

8   those, perhaps.  So you all should contact lawyers.  All I'm

9   giving you at this point is just information.  You all need

10  to go contact your own lawyers to understand the

11  ramifications of these issues, as it affects you.

12       We are going to recess now.  And after we recess, if

13  you all want to visit with the Trustees, you're welcome to do

14  that and they can certainly tell you what they think, if they

15  want to, and what information they have.  I think as a

16  general matter, the Court's experience has been, if they have

17  information, they're happy to provide you with that

18  information.  Having said that, if there's no money for them

19  to expend the cost, there has to be some arrangements made.

20  But I think as a general matter, I expect my Trustees to be

21  forthcoming with information.  The issue comes up when you

22  have 100 different people who want 100 different pieces of

23  information and the amount of work it takes and the cost

24  associated with it.  But I think they can give you

25  information, if you want it.

1          All right.  We are now in recess.

2                    (End of Proceedings.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>C E R T I F I C A T E</u>

2          I, CINDY SUMNER, do hereby certify that the

3     foregoing constitutes a full, true, and complete

4     transcription of the proceedings as heretofore set forth in

5     the above-captioned and numbered cause in typewriting before

6     me.

7

8

9

10

11

12

13

14

15                              _____

16                              CINDY SUMNER, CSR #5832
                                Expires 12-31-19
17                              Cindy Sumner, CSR
                                5001 Vineyard Lane
18                              McKinney, Texas 75070
                                214 802-7196
19

20

21

22

23

24

25